﻿Citation Nr: AXXXXXXXX
Decision Date: 01/22/19 Archive Date: 01/22/19

DOCKET NO. 180817-149
DATE: January 22, 2019

ORDER

Entitlement to an initial rating of 70 percent, but no higher, for service connected post-traumatic stress disorder is established throughout the period on appeal.

Entitlement to an earlier effective date for entitlement to service connection for post-traumatic stress disorder (PTSD) is denied.

Entitlement to effective date of December 10, 2009 for the grant of a rating of total disability based on individual unemployability is granted.

Entitlement to an effective date of December 10, 2009 for the grant of eligibility to Dependents' Educational Assistance under 38 U.S.C. chapter 35 is granted.

REMANDED

Entitlement to special monthly compensation (SMC) based on the need for aid and attendance, or by reason of being housebound is remanded.

FINDINGS OF FACT

1. Throughout the period on appeal the Veteran’s PTSD symptoms have most closely approximated occupational and social impairment with deficiencies in most areas, to include work, family relations, judgment, and mood; symptoms have included near-continuous depression affecting the ability to function, impaired impulse control with unprovoked irritability and occasional periods of violence, neglect of personal appearance and hygiene, and inability to establish and maintain effective relationships.

2. Throughout the period on appeal, the Veteran’s PTSD symptoms have not manifested in total occupational and social impairment. 

3. The Veteran’s claim for entitlement to service connection for PTSD was received on December 10, 2010. There is no evidence that the Veteran attempted to file a claim of service connection for PTSD prior to that date. As the Veteran appealed the initial rating granted for service-connected PTSD, the effective date of all ratings is evaluated in association with that appeal. 

4. A claim for entitlement to TDIU was raised by the record in accordance with the Veteran’s appeal of the initial rating for service-connected PTSD. The Veteran has been unable to secure or maintain gainful employment since at least December 10, 2009. 

5. Basic eligibility to Dependents' Educational Assistance under 38 U.S.C. chapter 35 began December 10, 2009.

CONCLUSIONS OF LAW

1. Entitlement to an initial rating of 70 percent, but no higher, for PTSD is established throughout the entire period on appeal. 38 U.S.C. §§ 1155, 5103, 5103A, 5107 (2012); 38 C.F.R. §§ 3.159, 3.321, 4.130, Diagnostic Code 9411 (2018).

2. The criteria for effective date earlier than December 10, 2009 for entitlement to service connection for post-traumatic stress disorder (PTSD) have not been satisfied. 38 U.S.C. 1155, 5110 (2012); 38 C.F.R. § 3.400 (2018).

3. The criteria for effective date of December 10, 2009, but no earlier, for a rating of total disability based on individual unemployability have been satisfied. 38 U.S.C. §§ 1155, 5110 (2012); 38 C.F.R. §§ 3.400, 4.16 (2018).

4. The criteria for an effective date of December 10, 2009, but no earlier, for basic eligibility to Dependents' Educational Assistance under 38 U.S.C. chapter 35 have been satisfied. 38 U.S.C. § 5110 (2012); 38 C.F.R. §§ 3.301, 3.155, 3.400 (2018).

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

On August 23, 2017, the President signed into law the Veterans Appeals Improvement and Modernization Act, Pub. L. No. 115-55 (to be codified as amended in scattered sections of 38 U.S.C.), 131 Stat. 1105 (2017), also known as the Appeals Modernization Act (AMA). This law creates a new framework for Veterans dissatisfied with VA’s decision on their claim to seek review. The Board is honoring the Veteran’s choice to participate in VA’s test program RAMP, the Rapid Appeals Modernization Program. 

The Veteran served on active duty in the United States Army from December 1969 to July 1973, to include service in Vietnam. The Veteran initially filed a claim of entitlement to service connection for PTSD in December 2009 and a claim of entitlement to TDIU in February 2016. These claims were most recently adjudicated in the first instance by the AOJ in April 2016. 

The Veteran also submitted a claim of entitlement to special monthly compensation (SMC) based on the need for aid and attendance or by reason of being housebound in March 2017 and that claim was adjudicated by the AOJ in the first instance in a May 2017 rating decision. 

The Veteran filed timely notices of disagreement with each decision by the AOJ. Prior to the issuance of a Statement of the Case, the Veteran submitted a RAMP election form, selecting the Higher Level Review lane. Accordingly, a July 2018 RAMP rating decision considered the evidence of record at the time of the submission of the RAMP election form. The Veteran timely appealed the RAMP rating decision to the Board in August 2018 and requested that the record be left open for 90 days from the date of the appeal, during which the Veteran could submit additional evidence to be reviewed by the Board. The Board has therefore considered all evidence submitted through November 15, 2018. 

The Veteran submitted evidence during a period of time when new evidence was not allowed. Therefore, the Board may not consider this evidence. The Veteran may submit this evidence, along with a Supplemental Claim. If the new evidence is relevant, VA will issue another decision on the claim, considering the new evidence in addition to the evidence previously considered. Specific instructions for filing a Supplemental Claim are included with this decision. 

1. Entitlement to an initial rating in excess of 30 percent, prior to September 19, 2013, and in excess of 70 percent to April 17, 2018

Disability evaluations are determined by the application of the facts presented to the VA’s Schedule for Rating Disabilities (Rating Schedule) at 38 C.F.R. Part 4. The percentage ratings contained in the Rating Schedule represent, as far as can be practicably determined, the average impairment in earning capacity resulting from diseases and injuries incurred or aggravated during military service and the residual conditions in civilian occupations. 38 U.S.C. § 1155; 38 C.F.R. § 4.1.

Where there is a question as to which of two evaluations shall be applied, the higher rating will be assigned if the disability picture more nearly approximates the criteria required for that evaluation. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7. Reasonable doubt as to the degree of disability will be resolved in the Veteran’s favor. 38 C.F.R. § 4.3.

Where an increase in the level of a disability is at issue, the primary concern is the present level of disability. Francisco v. Brown, 7 Vet. App. 55 (1994). Where the evidence contains factual findings that demonstrate distinct time periods in which the service-connected disability exhibits symptoms that would warrant different evaluations during the course of the appeal, the assignment of staged ratings is appropriate. See Fenderson v. West, 12 Vet. App. (1999); Hart v. Mansfield, 21 Vet. App. (2007).

In general, all disabilities, including those arising from a single disease entity, are rated separately, and all disability ratings are then combined in accordance with 38 C.F.R. § 4.25. Pyramiding, the evaluation of the same disability, or the same manifestation of a disability, under different diagnostic codes, is to be avoided when rating a Veteran’s service-connected disabilities. 38 C.F.R. § 4.14. 

Generally, separate disability ratings may be assigned for distinct disabilities resulting from the same injury so long as the symptomatology for one condition is not “duplicative of or overlapping with the symptomatology” of the other condition. Esteban v. Brown, 6 Vet. App. 259, 262 (1994). 

The Veteran is service connected for PTSD under 38 C.F.R. § 4.130, Diagnostic Code 9411. For rating purposes, Diagnostic Code 9411 is included among the General Rating Formula for Mental Disorders (“Rating Formula”) of 38 C.F.R. § 4.130. To be assigned a rating of 30 percent, the Veteran must demonstrate occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events).

To be assigned a rating of 50 percent, the Veteran must demonstrate occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g. retention of only highly-learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships. 

To be assigned a rating of 70 percent, the Veteran must demonstrate occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech that is intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work-like setting); inability to establish and maintain effective relationships. 

To be assigned a rating of 100 percent, the Veteran must demonstrate total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation or own name. 

The list of symptoms under the rating criteria are meant to be examples of symptoms that would warrant the evaluation, but are not meant to be exhaustive, and the Board need not find all or even some of the symptoms to award a specific evaluation. Mauerhan v. Principi, 16 Vet. App. 436, 442-3 (2002). In Vasquez-Claudio v. Shinseki, F.3d 112, 117 (Fed. Cir. 2013), the Court also held that a Veteran may only qualify for a given disability rating under § 4.130 by demonstrating the particular symptoms associated with that percentage, or others of similar severity, frequency, and duration. 

Indeed, considerations in evaluating a mental disorder include the frequency, severity, and duration of psychiatric symptoms, the length of remissions, and the Veteran’s capacity for adjustment during periods of remission. The evaluation must be based on all evidence of record that bears on occupational and social impairment rather than solely on an examiner’s assessment of the level of disability at the moment of the examination. 38 C.F.R. § 4.126(a).

As the Veteran has appealed the initial rating of service connection for PTSD, the Board will evaluate the propriety of the rating throughout the entirety of the appeal period, from the date of the claim to the date of the Veteran’s Higher Level Review RAMP election form in April 2018. 

The Veteran first filed a claim of entitlement to service connection for PTSD in December 2009. The record first shows evidence of symptoms of a possible acquired psychiatric disorder in a March 1998 report from the Florida Office of Disability Determinations that documented the symptom of severe depression. 

The Veteran’s VA treatment records show that in March 2010, the Veteran was referred for psychiatric treatment from the Urgent Care department at Gainesville VA Medical Center (VAMC) after reporting symptoms of PTSD, including difficulty sleeping, nightmares, crying spells, feelings of sadness and guilt associated with “things he has done,” and frequent flashbacks. At that time, the Veteran was oriented to person, time, place, and situation. He was appropriately dressed with adequate hygiene. His speech was within normal limits. He displayed a normal range of affect and was tearful throughout the interview. The treating doctor noted that the Veteran was candid and rapport was easily established. His thought processes appeared linear and there were no signs of a thought disorder or psychosis. The Veteran denied any current or recent ideation to harm himself or others. He stated that he had experienced symptoms since returning from Vietnam, but felt that the severity of symptoms had increased in the previous six months. He was unable to identify a cause for this increase. 

The Veteran reported for followup initial screening and treatment in May 2010. Psychologists noted that the Veteran tended to have expectancies regarding inadequacy, powerlessness, and helplessness in dealing with his environment. He tended to “globally attribute negative events in [his] life to his own incompetency and inadequacy.” The Veteran reported feeling distressed, unhappy, and sad. He stated that he had lost interest in normal activities and a sense of pleasure in things that were previously enjoyed. He reported delusions and hallucinations, as well as bizarre thought content and poor judgment. He was seen as being apathetically indifferent toward others and avoided them when possible. He claimed not to enjoy close relationships and to prefer social isolation and detachment. The Veteran also reported problems with concentration and decision making, as well as sudden and rapid mood swings, and affective instability involving a propensity to become rapidly anxious, angry, depressed, or irritable. On that front, he told psychologists that he had a considerable amount of hostility and poor control over anger expression. According to one treating psychologist, the Veteran reported a belief, “in the instrumental utility of aggression” that corresponded with a tendency to physical displays of anger, including damaging property, physical fights, and threats of violence. 

When interviewed about his background in association with this May 2010 intake, the Veteran reported that he lived together in a family home with his wife, his youngest daughter, his daughter’s boyfriend, and three grandchildren. He became tearful as he talked about losses he had experienced both of family and during his service in Vietnam. At that time, he reported symptoms of depression, anxiety, decreased concentration, short-term memory problems, insomnia, low energy to complete tasks, social aversion and isolation, a history of poor anger control with verbal outbursts when not using marijuana, and a history of suicidal ideations. He stated that these symptoms had existed since service, but that they had intensified over the prior eight to nine years. 

In June 2010, the Veteran presented for a mental health consult at the Orlando VAMC. In his initial visit with the treating psychiatrist, Dr. I.M.J., the Veteran endorsed feelings of anxiety, decreased concentration, insomnia, low energy with limited motivation, social isolation, and poor anger control. He reported that he normally got only two hours of sleep per night due to nightmares and that he felt depressed. He denied suicidal thoughts at that time, but noted that he had experienced them in the past. He stated, however, that “there is no way I could do anything. I care too much for my family and I would never want to put them through that.” 

On mental status examination at that time, Dr. I.M.J. noted that the Veteran appeared dressed appropriately with appropriate grooming and normal hygiene. He had relaxed motor activity and was cooperative. His speech was at normal rate and volume. His thoughts were normal, relevant, coherent, and logical, but he had intrusive thoughts, images, and perceptions. His mood was depressed and his affect was congruent with his mood. His orientation and memory were normal. His judgment was good while his insight was fair. His attention was distractible and he sometimes had problems with staying focused. He reported having auditory hallucinations three to four times per month, specifically of his dead son talking to him, telling him to “look out.” He reported hearing these hallucinations since his son died in 1984. 

In August 2010, the Veteran underwent a VA examination. There, the examiner reported that the Veteran’s appearance was clean and his psychomotor activity was unremarkable. His speech was spontaneous and coherent and his attitude was cooperative. His mood was anxious and his affect was full. Attention and concentration were intact, memory was normal, and the Veteran was oriented to person, time, and place. His thought process and content were unremarkable and he demonstrated no delusions or hallucinations. Judgment and insight were good and the Veteran reported no suicidal or homicidal ideations. 

The Veteran demonstrated fair impulse control but endorsed prior episodes of violence. Specifically, the Veteran reported that about a year prior to the examination, he had “punched a kid in the face because the kid was near his car.” Regarding PTSD symptoms, the examiner noted that the Veteran experienced intense psychological distress at exposure to cues that resembled an aspect of the Veteran’s traumatic event. The Veteran demonstrated markedly diminished interest in significant activities and a feeling of detachment from others. He had difficulty falling or staying asleep, irritability or outbursts of anger, difficulty concentrating, and an exaggerated startle response. These symptoms were chronic and the Veteran reported no periods of remission. 

The Veteran reported a daily depressed mood that had occurred “for years,” along with brief, occasional crying spells. He had chronic distressing memories, nightmares, and flashbacks. He reported daily, but brief, moments of anhedonia, as well as a sense of detachment that he described as his normal state of being. The Veteran did, however, report that he went bow hunting once a year with some friends, and that he enjoyed going to gatherings of “like-minded Veterans” who collected and worked on old cars. 

Despite the symptoms noted above, the examiner concluded that the Veteran did not have a diagnosis of PTSD and, instead, attributed the Veteran’s symptoms to cannabis dependence. In the examiner’s opinion, the examination yielded unreliable or inconsistent results. The examiner stated that the Veteran was vague in reporting his symptoms until after completing a PTSD checklist and that the Veteran’s subjective complaints during the examination appeared out of proportion to the objective examination findings. 

In August 2010 regular mental health notes, the Veteran was oriented to person, place, time, and situation. His mood was anxious and depressed with a constricted affect. There were no observed psychotic or manic features. He was cooperative and actively participated in the session. He maintained eye contact, with speech at a normal rate, volume, and articulation. His thought progression was logical, linear, and goal-directed. He reported daily forgetful episodes regarding recent memory, but his remote memory was intact. His attention and concentration were normal, and insight and judgment were good. He denied suicidal or homicidal ideations. 

The reports of the Veteran’s mental status examinations in August 2010 largely reflect those going forward, through February 2018, including at his last mental health visit of record. Generally, the Veteran has appeared alert and oriented. He has been cooperative and calm. His speech has been at normal rate and volume. His mood has generally been depressed with a restricted affect, although on occasion his mood has been reported as euthymic. His thought process has been normal, logical, and goal-oriented. He has had some instances of normal memory, while at other times his memory—especially his short-term memory—has been impaired. At times he has had lapses of attention and concentration, while at other times they have been deemed normal. Insight and judgment have ranged from fair to good. 

In a September 2010 psychiatry note, the Veteran discussed the ways in which his mental health symptoms caused him to isolate, noting that he had “13 grandchildren and they do not understand the days that I have to go sit in the woods.” He also reported that he sought mental health treatment after the third instance of nearly choking his wife to death in his sleep, an action he associated with nightmares he had suffered from since returning from Vietnam. 

In November 2010, Dr. D.P, the Veteran’s regular psychologist, submitted a statement on the Veteran’ s behalf in association with his claim for service connection. Dr. D.P. stated: 

His symptoms include intrusive thoughts, hypervigilance, flashbacks, nightmares, avoidance, hyperstartle response, emotional numbing, extreme anxiety and irritability, and feelings of foreshortened future. The severity of these symptoms has made it extremely difficult for [the Veteran] to venture into public places and to be around large groups of people. He rarely leaves his home and is unable to function effectively in employment and interpersonal situations due to the severe anxiety associated with his PTSD. He has never had a suicide attempt but has had many episodes of suicidal thoughts since his Vietnam tour. His trauma-related symptoms make it difficult for him to function independently and greatly effect (sic) his interpersonal relationships, including his inability to seek out social relationships...In summary, it is my professional opinion that, from a mental health standpoint, [the Veteran] suffers from severe, chronic PTSD and is no longer capable of participating in gainful employment.

In February 2011 treatment, the Veteran reported that his symptoms had improved since his initial mental health intake in May 2010, but that he still isolated himself, had lack of trust in others, fear of crowds, hypervigilance, a heightened hyperstartle response, and that he continued to experience nightmares. Similarly, in April 2011, the Veteran reported that medication and therapy were helping with his depression and trauma-related symptoms, and that he would like to keep these as continuing goals. He also reported that he had experienced some hard times recently with his depression and PTSD symptoms, noting that spring and summer were the most difficult seasons for him as the warm, tropical weather reminded him of being in Vietnam. 

In May 2011 the Veteran reported being concerned about health situations regarding his young granddaughter and other family members. In August 2011, he related that he experienced some good days and some bad days concerning his PTSD, and that he had recently visited his father out of state and had celebrated his 42nd wedding anniversary with his wife. In a September 2011 mental health visit, the Veteran reported feeling anxiety because he had very recently seen someone killed in a motorcycle accident. The treating psychologist reported that they processed the issue for the first half of the session, after which the Veteran asked about getting into the center’s anger management group. 

In December 2011, the Veteran reported that he was now sleeping approximately four hours per night—up from the two hours per night he reported when he first began treatment. He continued to experience PTSD as evidenced by lack of trust in others, hypervigilance, heightened hyperstartle response, and fear of crowds. He related that he would be spending the Christmas holiday with his family, including his 14 grandchildren. 

In July and August 2012, the Veteran reported trouble with his granddaughter who lived with him and his wife, noting that he was concerned about her getting involved with drugs, alcohol, self-harm, and a “bad crowd.” 

In October 2012, the Veteran sought a refill of Ambien for help with sleeping issues. He reported that he needed to sleep in a recliner or he would get claustrophobic. Regarding hobbies, he described fulfillment in his role as a grandfather and that he enjoyed seeing car shows. At that time, his mood was anxious and sometimes dysphoric and his thought processes were obsessive, with no loosening of associations or tangentiality. He was, however, oriented in all spheres and had “fairly good” insight into his illness and judgment regarding his condition. 

In November 2012, the Veteran underwent a new VA examination. The examiner reported a diagnosis of cannabis dependence, in full remission, and depressive disorder, not otherwise specified, but stated that the Veteran’s symptoms did not meet the criteria for PTSD. The Veteran reported chronic nightmares, “at least five a week,” as well as flashbacks and physical reactions, such as shaking, in response to cues that triggered reminders of his time in Vietnam. He acknowledged a constant attempt to avoid thinking or talking about his traumatic experiences. When asked about relationships, the Veteran described having five close friends and loving relationships with family members, although his primary leisure activity was going hunting—an activity that he acknowledged at other points throughout the record as a solo one. 

The Veteran reported episodic irritability and anger, concentration that was only “sometimes” good, chronic hypervigilance, and episodic heightened startle response. He frequently experienced a depressed mood, reportedly five days per week, although he denied current suicidal or homicidal ideations. There were no signs or symptoms of mania or psychosis and he denied experiencing panic attacks. The Veteran was alert and fully oriented and there was no evidence of remote memory impairment. He required one prompt on a short-term memory assessment. The examiner noted that, based on the Structured Interview of Malingered Symptomatology (SIMS), the Veteran’s SIMS Total score was elevated above the recommended cutoff score for the identification of likely feigning of symptoms. The examiner did not provide the data behind this assessment, however, according to the examiner, the Veteran “endorsed a number of symptoms and impairment (sic) that are highly atypical of individuals who have genuine psychiatric or cognitive disorders.” 

In a July 2013 statement to the Board, the Veteran reported that for years he had avoided leaving home because he did not like to be around people. If he went to a store, he would not be able to stay there long, and if he went grocery shopping with his wife, he would need to stay in the car because there were too many people in the store and it upset him. This was because he did not like crowds and was constantly worried about his safety. He stated that he felt numb and detached, and that he spent his days sitting and staring out of the window, although he did have a few friends who were buddies from Vietnam. He reported that he only slept about four hours per night and that this was with the aid of Ambien. He lamented that he could not sleep in the same room as his wife due to his frequent nightmares. 

In October 2013, the Veteran submitted a September 2013 independent medical opinion from a private psychologist, Dr. J.M. Dr. J.M. reviewed the entire record and interviewed the Veteran, and concluded that the correct diagnosis based on the Veteran’s symptoms was PTSD with concomitant depression, and that this was directly related to the Veteran’s claimed in-service stressor. Dr. J.M. opined that, because of the Veteran’s PTSD-related symptoms, the Veteran had severe occupational and social impairments with deficiencies in most areas. He also opined that because of these impairments, the Veteran had been unable to secure or maintain a substantially gainful occupation since at least 1998, when severe depressive symptoms were first noted. 

Dr. J.M. acknowledged the discrepancies between the Veteran’s regular VA mental health care visits and the two VA examinations. Regarding the November 2012 examiner’s opinion that the Veteran had exaggerated his symptoms, Dr. J.M. first noted that the examiner had not included the raw scores from the SIMS test to allow for third-party analysis of the results. Furthermore, Dr. J.M. referenced numerous studies since the 1980s demonstrating that Vietnam veterans ubiquitously presented symptoms in a way that appeared to overreport psychopathology in a “fake-bad” direction. Reporting from one study that concluded this phenomenon was not well understood, Dr. J.M. opined that these suspect responses were not an attempt at feigning symptoms, but in fact “a cry for help, and a valid presentation of combat-related PTSD symptoms.” He reported that during his interview with the Veteran, he did not detect any attempts by the Veteran to feign symptoms. Dr. J.M. went on to note that at a regular mental health visit just days after the November 2012 examination, the Veteran’s psychiatrist, Dr. I.M.J., continued to identify PTSD related to the Veteran’s traumatic experiences in Vietnam. In his opinion, Dr. J.M. remarked that Dr. I.M.J. was the Chief of Mental Health at that facility and held a credible opinion. 

Regarding the August 2010 examiner’s remarks that the Veteran’s symptoms were entirely attributable to the Veteran’s drug use, Dr. J.M. disagreed with that opinion, given the Veteran’s detailed description of his traumatic experiences. Dr. J.M. noted that the Veteran had initially begun using heroin and marijuana almost immediately after his initial traumatic experience in Vietnam and had continued using marijuana upon his return. Dr. J.M. opined that this was likely a form of self-medication, given the Veteran’s narrative of feeling better able to cope with anxiety and irritability when using marijuana. 

Dr. J.M. provided an extensive analysis of the Veteran’s prior medical history, noting the frequency of instances in which the Veteran discussed depression, irritability, and the need to isolate himself, sometimes even around family members and friends. Based on the Veteran’s frequent intrusive thoughts, feelings of numbness, social isolation, and chronic sleep impairment, Dr. J.M. concluded that the impact of the severity of the symptoms on the Veteran’s social and occupational functioning meant that he had been unable to perform the mental demands needed for any type of work on a sustained basis. 

The Veteran continued regular mental health treatment in 2015, with mental status examinations largely mirroring those from prior visits. In a March 2016 treatment, the Veteran stated that he had some concern that he might have been too isolated and was spending too much time at home by himself. Nevertheless, he stated that he kept busy with home projects and would soon resume fishing, a favorite activity. In addition, he remarked that he loved being with his grandchildren and, since he had 17 of them, there was always one or more of them around. 

In an April 2016 psychiatric treatment note, the Veteran related that he continued to re-experience the traumatic events from Vietnam roughly two to three times per week. He expressed concern about his granddaughter and stated that he would like to isolate less than what he was doing at that time. 

In June 2016, the Veteran expressed pleasure that he had been able to acquire a 14-foot fiberglass boat and that he would now be able to take one or two people along when he went fishing. Nevertheless, he reported that he remained isolated at home, staying mostly in the bedroom to escape the “drama” present on account of his two granddaughters who lived in the house. Similarly, in July 2016, he noted that “dealing with his kids and grandkids” had been very stressful. On mental status examination, his concentration was notably brief. 

In September 2016, the Veteran reported continued difficulties with his drug-addicted daughter and granddaughter and feelings that his granddaughter was being enabled by his wife. Noting his dislike for strife, he stated that he avoided addressing this codependency issue with his wife and, instead, spent as much time as he could outside the house hunting and fishing. 

In a May 2017 mental health outpatient note, the Veteran reported that his depressed mood “comes and goes” and in June 2017 he stated that his history of traumatic experiences in Vietnam aside, he “actually saw himself doing better, especially with [a] reduced level of stress at home.” In October 2017, however, he reported in a mental health note that in the prior two weeks he had been feeling down, depressed, or hopeless more than half the days, with continued trouble falling and staying asleep. 

In November 2017, the Veteran submitted a followup assessment by Dr. J.M. from earlier that month. After again reviewing the file and interviewing the Veteran over video, Dr. J.M. reiterated his prior assessment and added that, since the September 2013 assessment, the Veteran had continued to have persistent PTSD-related symptoms and had become increasingly dependent on his wife, including for activities of daily living. 

During the interview with Dr. J.M., the Veteran reportedly stated, “I have trouble concentrating…I’m easily irritable; anyone in my family will tell you that. I would scream and yell about things. Now I sit in my bed by myself. I’m always suspicious of people. I don’t trust anyone. I don’t like people coming into my house that I don’t know because I don’t trust anybody. I am always watching who is in parked cars alongside me at lights. I check my locks five or six times a night, and even walk the perimeter of the yard to make sure nobody is around or bothering us.” 

Regarding his self-care, the Veteran noted, “My wife buys all my food and prepares all my meals. I don’t care what I wear so she helps me get dressed. If it were up to me I would put on anything, but she makes sure I put something on that goes together instead of a raggedy t-shirt. She even helps me bathe and makes sure I wash my arm pits and back and everything. I don’t shave; I have a full beard and long hair. I don’t like anybody touching my head so I don’t get haircuts. She manages all of my medication for me, putting it in the right box every day so I take the right ones at the right time. If she didn’t do that for me I would probably take the wrong ones.” 

Dr. J.M. further assessed the Veteran’s activities based on a November 2017 statement to VA submitted by the Veteran’s wife. She related that the Veteran did not like to be around people and that he would isolate himself. He stopped going to the grocery store because he would yell at people if they did something wrong. She reported that the Veteran stayed in his bedroom about 80 percent of the time and that he would not sit out with the rest of the family. She described the Veteran as “suspicious and paranoid,” saying that he would have hallucinations such as people being in the kitchen, and that he would do and say things and later insist that he had not. She reported hearing the Veteran talking to himself when alone in his room. She also stated that within the previous year, the Veteran had been falling a lot. She suspected that this was because he did not pay attention and would simply trip over his feet, and that she had to make sure he had a clear path throughout the house with nothing that he might trip over. She claimed to make all of the household decisions and that she basically never left the Veteran alone, treating him like a child. 

Dr. J.M relayed that when the video interview began, the Veteran was sitting in a dark room and that he could not actually see the Veteran until the Veteran’s wife came in to raise the blinds. He noted that the Veteran appeared with long, unkempt hair and a beard. He was pleasant and cooperative throughout the interview, but his mood and affect were depressed. He was fully oriented, although he reported being disoriented when first waking up and when he had not yet taken his medication. Eye contact was reasonable, considering the Veteran was appearing through a smart phone, speech was clear, and his thought process and communication was linear. His thought content was appropriate for the interview; he denied auditory hallucinations, but said that he sometimes saw someone in his closet. Recent memory was at least fair and remote memory was not tested. There were no difficulties identified with impulse control. The Veteran reported that he regularly slept from two in the morning until six in the morning, and that after waking up he would spend most of the day watching television in the recliner where he slept. He acknowledged that he had bought a boat for fishing three years prior, but had only used it once because he did not like going out in public. In a corresponding statement to VA around the time of the examination, the Veteran also reported having panic attacks all the time, probably three to four times per week. 

The Veteran reported difficulty concentrating and that he frequently found himself wanting to be somewhere else—specifically in the woods owned by a friend who allowed him to go on his property. The Veteran would “just go out and set in” to the woods two or three times a week. He said that when he tried to read a newspaper, he could read it and not remember what he had read. He admitted having to be reminded by his wife to do some important things, such as brushing his teeth. He reported getting help from his wife and granddaughters on a regular basis. In his November 2017 statement to VA, the Veteran claimed that if he did not write something down, it was forgotten about completely, and that he would even forget the names of some family members, noting that he would see them and know that they were family, but be unable to remember their names. 

The Veteran described his relationships with others, stating that he had difficulty maintaining friendships, but that he had three friends—two who were out of state, as well as the owner of the nearby woods. He stated that he could make new friends if he wanted, but that it had been a while since he last did. When asked about how much of a problem his family had experienced because of his PTSD, he stated that they were always mad at him because he did not do anything with them, and that it had been that way for seventeen or eighteen years.

The Veteran denied needing the aid and attendance of another person in order to protect himself from hazards or dangers in daily life, but acknowledged that he did not always remember to take his pills and that his wife would sometimes prompt him to bathe. The Veteran’s wife then joined the interview and expressed her concern at leaving the Veteran alone. She opined that if she left him alone for long periods of time, he would not bother to take his medication or to eat. She acknowledged that sometimes when she was gone, the Veteran would make a peanut butter sandwich to eat. 

The Veteran continued regular mental health treatment with VA after the interview with Dr. J.M. In a December 2017 treatment visit, the Veteran noted continued problems with his granddaughter, and in February 2018 he noted a decreased interest and pleasure in activities. He reported feelings of detachment from others, avoidance of distressing memories, and external reminders of trauma. Later that month, he reported that he had been continuing to experience nightmares, ruminations, and hypervigilance. Mental status examinations at those times were similar to those previously discussed, dating back to August 2010. 

As described above, the Veteran’s file documents an extensive history of mental health treatment and his observed and self-described symptoms related to PTSD. Procedurally, the Veteran’s claim of entitlement to service connection for PTSD was denied multiple times by the AOJ before it was ultimately granted by the Board in a February 2016 decision. In April 2016, the AOJ issued a rating decision effectuating the February 2016 grant. At that time, the AOJ established a staged rating for PTSD. The initial rating, dating back to the filing of the claim was 30 percent. The AOJ then increased the rating to 70 percent, effective September 19, 2013, the date of Dr. J.M.’s first examination and medical opinion. 

For the reasons that will be discussed below, the Board finds that the Veteran’s service-connected PTSD warrants a rating of 70 percent, but no higher, throughout the entire period on appeal. 

As is noted above, to warrant a rating of 70 percent the Veteran must demonstrate occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech that is intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work-like setting); inability to establish and maintain effective relationships. 

The Board first notes that the Veteran’s initial referral to VA mental health care and subsequent intake visits show a picture of severe mental health symptoms. In May 2010 he reported hallucinations and bizarre thought content and appeared to be apathetically indifferent to others. He did not appear to enjoy any close relationships. He reported problems with concentration and decision making. He identified sudden and rapid mood swings and affective instability. He endorsed considerable hostility and poor control over anger expression, leading to physical displays of anger and threats of violence. The latter was further supported by the statement in his August 2010 VA examination that within the previous year he had punched someone for being near his car. 

Although those initial symptoms appeared to wane to some extent after beginning treatment, the Veteran’s mental health picture has demonstrated some consistent themes throughout the appeal. Mental status examinations have revealed an almost constant state of depression combined with flattened or restricted affect, with only intermittent visits in which the Veteran’s mood was identified as euthymic. That depression has limited the Veteran’s effective and independent functioning as he has often expressed little to no desire to leave his bedroom. He has experienced persistent nightmares and intrusive thoughts. He has expressed a chronic tendency toward isolation, preferring to avoid large crowds and general interaction with strangers, and has only minimal interactions with friends. At times he has seemed to have a good relationship with family members, noting at one point the enjoyment he received out of being a grandfather, but he has also sought to avoid his own family members during stressful situations. He has also frequently endorsed finding comfort by going fishing or going out into the woods, activities where he can be by himself and be completely away from any people. 

The Board acknowledges the medical opinions from the August 2010 and November 2012 examinations, the latter of which suggested that the Veteran may be exaggerating his symptoms. The Board, however, finds that Dr. J.M.’s exposition on the research documenting an over-exaggeration of PTSD symptoms in Vietnam veterans is a persuasive explanation of this phenomenon. Indeed, the Board recognizes that, although this understanding may diminish the importance of any one specific evaluation of—or statement from—the Veteran, it further amplifies the significance of those symptoms the Veteran has consistently demonstrated over time. To that end, the Board holds the November 2010 letter from Dr. D.P. with particular probative value, given that it was written by the Veteran’s personal psychologist who had the opportunity to provide an opinion based on numerous observations over time. That letter explicitly stated that the Veteran had symptoms so severe as to make it difficult to venture into public places or to be around large groups of people, and that greatly affected his interpersonal relationships. It also stated that, from a mental health standpoint, the Veteran was no longer capable of participating in gainful employment. 

Furthermore, the Board notes that the AOJ granted a rating of 70 percent, effective September 19, 2013, as that was the date of Dr. J.M.’s examination and opinion. That opinion, however, was not based solely on Dr. J.M.’s examination, and did not purport to reflect the status of the Veteran’s PTSD as of that date only. Indeed, Dr. J.M. based his opinion in large part on his review of the Veteran’s medical records. He specifically identified excerpts of evidence from the beginning of the Veteran’s mental health treatment—much of which has been listed above—that, when read together, demonstrated occupational and social impairment, with deficiencies in most areas. 

Therefore, based on the foregoing, the Board finds that the Veteran’s symptoms did not increase in severity as of September 19, 2013, but that, instead, Dr. J.M.’s report of that date documented the severity of symptoms throughout the period on appeal. Accordingly, a rating of 70 percent is warranted from the date of the claim. 

The Veteran’s symptoms have not warranted a rating of 100 percent at any point during the appeal. Again, to warrant a rating of 100 percent the Veteran must demonstrate total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation or own name. 

Mental status examinations have occasionally noted some obsessive thought content, particularly during periods of stress, however aside from the “bizarre” thought content noted in May 2010, there has been no record of gross impairment in thought processes or communication. The Veteran’s speech has consistently been normal and he has maintained a cooperative approach to mental health visits, despite a chronically depressed mood and restricted affect. He has not demonstrated grossly inappropriate behavior, nor has he been deemed to be in persistent danger of hurting himself or others. He has consistently been documented as being oriented to person, time, place, and situation. 

The Board acknowledges that the Veteran has, on occasion, endorsed symptoms consistent with a 100 percent rating. For example, in June 2010, the Veteran reported that he had been hearing the voice of his dead son three to four times per month, ever since his son died in 1984. By August 2010, however, he was reporting no audiovisual hallucinations. Likewise, in his interview with Dr. J.M. and his corresponding statement to the Board in November 2017, the Veteran reported seeing someone coming out of his closet. However, at regular mental health visits both before and after this examination—in June 2017, December 2017, and February 2018—he reported no audiovisual hallucinations. In an October 2017 medication evaluation, the Veteran was not specifically asked about hallucination, but a mental status examination revealed no delusional thoughts. 

In the November 2017 examination, Dr. J.M. reported that, visually, the Veteran appeared with long, unkempt hair and a full beard. At that time, the Veteran acknowledged that he relied on his wife’s prodding to bathe regularly and to dress in matching clothing. Neglect of personal hygiene, however, is contemplated by a 70 percent rating. Based on mental status examinations surrounding the November 2017 examination, in which the Veteran was noted to have an appropriate appearance and no deficiencies in hygiene were reported, there is no indication that his appearance at this time reflected an inability to maintain minimal personal hygiene. 

The Board also notes the Veteran’s November 2017 statement in which he claimed to have difficulty remembering the names of some relatives. The Board is not persuaded that this represents a symptom warranting a 100 percent rating. Although both the Veteran’s statements in November 2017, as well as his wife’s, appear to portray the Veteran has having significant difficulty with memory, impairment of short- and long-term memory are contemplated by a rating of 50 percent. Throughout the period on appeal, mental status examinations have at times reported the Veteran’s memory as normal, while at other time noted that his short-term memory was only fair. Despite some memory impairment, in treatment sessions, the Veteran has displayed an intimate knowledge of the affairs of his immediate family, including the health and legal trouble of one granddaughter who has lived with him, the academic accolades of another granddaughter who has lived with him, and the relationship between his wife and granddaughter. Whether the November 2017 statement reflects a temporary exacerbation, or the type of exaggeration of symptoms noted by Dr. J.M., the Board does not find that the record as a whole demonstrates the type of “memory loss for names of close relatives” that could warrant a rating of 100 percent. 

Although the Veteran prefers to isolate, he maintains relationships with his family, albeit strained, and his symptoms do not manifest in total social impairment. 

Although the Board recognizes the difficulties that the Veteran’s symptoms have placed on both the Veteran and his family, the preponderance of the evidence is against a finding that those symptoms have amounted to total occupational and social impairment so as to warrant a rating of 100 percent. As the preponderance of the evidence is against this finding, the “benefit of the doubt” rule is not applicable and the Board must deny the claim for a rating in excess of 70 percent. See 38. U.S.C. §5107(b); Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 

Effective Date

The general rule with respect to the effective date of an award for compensation based on an original claim or a claim for increase will be the date of the receipt of the claim or the date entitlement arose, whichever is later. 38 U.S.C. § 5110(a); 38 C.F.R. § 3.400. 

2. Entitlement to an earlier effective date for the evaluations of post-traumatic stress disorder (PTSD)

By an April 2016 rating decision, the Veteran was granted entitlement to service connection for PTSD dating back to his initial claim in December 2009. In an April 2016 notice of disagreement, the Veteran indicated that he disagreed with the evaluation of the disability and the effective date of the award. Specifically, the Veteran wrote, “The Veteran should have been found entitled to a higher rating and earlier effective date for his service-connected PTSD from December 10, 2009 forward.” 

It is unclear based on the wording of the Veteran’s disagreement whether he specifically disagreed with the effective date of service connection for PTSD, or only with the effective dates related to his staged rating. However, the issue has been certified to the Board as stated above and, resolving all reasonable doubt in the Veteran’s favor, the Board has interpreted the issue to mean that the Veteran disagrees with both the effective date of service connection as well as the effective date of the separate evaluations. 

Regarding the effective date of the evaluations, in the April 2016 rating decision, the AOJ awarded the Veteran a 30 percent rating for PTSD, effective the date of the claim, and a rating of 70 percent beginning September 19, 2013. By appealing the initial rating throughout the entire claim period, the Veteran effectively asked the Board to review the appropriateness of the rating at all times throughout the period on appeal. That is to say, an evaluation of the effective date of each part of a staged rating is part and parcel of the Board’s review of the claim for a higher initial rating. Accordingly, the Board has already evaluated the effective dates of the ratings in its analysis of the claim for a higher initial rating in the section above. 

Regarding an earlier effective date for the grant of service connection, the effective date is determined by the date of the receipt of the claim. Here, the Veteran first submitted a statement on December 10, 2009, in which he said, “I would like to submit an additional claim for Post Traumatic Stress Disorder, Hypertension and Rheumatoid Arthritis due to my service in Vietnam.” The statement was signed by the Veteran, on December 10, 2009. 

There are no documents of record prior to December 10, 2009 indicating that the Veteran wished to file a claim of entitlement to service connection for PTSD. Therefore, by law, the earliest effective date for service connection is December 10, 2009. This remains true, regardless of the date of first onset of PTSD symptoms. 

As the preponderance of the evidence is against a finding that the Veteran submitted a claim prior to December 10, 2009, the “benefit of the doubt” rule is not applicable and the Board must deny the claim for an earlier effective date of service connection for PTSD. See 38. U.S.C. §5107(b); Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 

3. Entitlement to an effective date prior to September 19, 2013 for the grant of a rating of total disability based on individual unemployability

When entitlement to a TDIU is raised during the adjudicatory process of the underlying disability, it is part of the claim for benefits for the underlying disability. See Rice v. Shinseki, 22 Vet. App. 447 (2009). Thus, although the Veteran first filed a claim of entitlement to TDIU in February 2016, the claim for TDIU is considered a part of the Veteran’s claim for a higher initial rating for PTSD. The earliest possible effective date of the TDIU claim, therefore, dates back to the initial claim for PTSD in December 2009. 

In its April 2016 rating decision, the AOJ granted entitlement to a TDIU, effective September 19, 2013. As was noted in the section evaluating the rating for PTSD, this was the date of Dr. J.M.’s examination and medical opinion. Notably, the AOJ also granted a rating of 70 percent for PTSD based on that opinion, effective the same day. 

At issue before the Board, then, is whether the Veteran is entitled to a TDIU effective prior to September 19, 2013. It is the established policy of VA that all Veterans who are unable to secure and follow a substantially gainful occupation by reason of service-connected disabilities shall be rated totally disabled. See 38 C.F.R. § 4.16. In determining whether unemployability exists, consideration may be given to the Veteran’s level of education, special training and previous work experience, but not to his age or to any impairment caused by nonservice-connected disabilities. See 38 C.F.R. §§ 3.341, 4.16, 4.19.

A total disability rating for compensation may be assigned where the schedular rating is less than total when the disabled person is, in the judgment of the rating agency, unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities, provided that, if there is only one such disability, this disability shall be ratable at 60 percent or more. If there are two or more disabilities, there shall be at least one disability ratable at 40 percent or more and the combined rating must be 70 percent or more. See 38 C.F.R. § 4.16(a). 

The ultimate question of whether a Veteran is capable of substantial gainful employment is not a medical one; that determination is for the adjudicator. Geib v. Shinseki, 733 F.3d 1350, 1354 (Fed. Cir. 2013); Floore v. Shinseki, 26 Vet. App. 376, 381 (2013). As such, the focus of the examiner is not on whether the Veteran is unemployable due to his service-connected disabilities but the functional impairment caused solely by his service-connected disabilities.

Pursuant to the section above, in which the Board granted a rating of 70 percent for PTSD effective to the date of the December 10, 2009 claim, the Veteran is schedularly eligible for TDIU effective that date as well. The remaining question, then, is the point at which the Veteran became unable to obtain and maintain substantially gainful employment due to his service-connected disabilities. 

Florida Office of Disability Determination documents show that the Veteran has been out of work since 1997 and he was awarded disability benefits based on rheumatoid arthritis. The AOJ awarded TDIU based on the September 19, 2013 medical opinion from Dr. J.M. that stated that he believed that the Veteran had been “unable to secure or maintain a substantially gainful occupation since at least 1998 as a result of his combat-related PTSD,” and that because of PTSD symptoms, he was “unable to perform the mental demands needed for any type of work on a sustained basis.” The Board notes that, although Dr. J.M.’s opinion was dated September 19, 2013, it was largely based on medical evidence of record prior to that date. Dr. J.M. noted a March 1998 record of depression as well as a significant number of VA treatment records, beginning in March 2010. The AOJ therefore erred when it determined that there was no medical evidence of record prior to September 19, 2013 that showed entitlement to TDIU. 

Furthermore, the Veteran’s VA psychologist, Dr. D.P., submitted a letter on the Veteran’s behalf in November 2010. In the letter, Dr. D.P. enumerated the Veteran’s symptoms and stated, in pertinent part, “The severity of these symptoms has made it extremely difficult for [the Veteran] to venture into public places and to be around large groups of people. He rarely leaves his home and is unable to function effectively in employment and interpersonal situations due to the severe anxiety associated with his PTSD...His trauma-related symptoms make it difficult for him to function independently...In summary, it is my professional opinion that, from a mental health standpoint, [the Veteran] suffers from severe, chronic PTSD and is no longer capable of participating in gainful employment.” 

Based on these two independent assessments, coming nearly three years apart and supported with significant medical rationale, the Board finds that the Veteran has been unable to secure or maintain gainful employment as a result of service-connected PTSD throughout the entirety of the claim period. Accordingly, a rating of TDIU is warranted effective the date of the claim of entitlement to service connection for PTSD, December 10, 2009. Entitlement to a TDIU prior to that date is not warranted, as the Veteran was not service connected for PTSD prior to that date. 

4. Entitlement to an effective date prior to September 19, 2013 for the grant of eligibility to Dependents' Educational Assistance under 38 U.S.C. chapter 35

Dependents’ Educational Assistance (DEA) benefits may be paid to dependents of a Veteran who has a service-connected disability that is rated permanent and total. 38 U.S.C. §§ 3500, 3501, 3510; 38 C.F.R. § 3.807 (a), 21.3021. A total disability may be assigned where a Veteran’s service-connected disabilities are rated 100 percent disabling under the rating schedule, or if the Veteran is deemed unemployable due to service-connected disabilities. 38 C.F.R. §§ 3.340, 3.341.

Here, the effective date of the Veteran’s entitlement to eligibility to DEA is essentially tied to the effective date for the award of TDIU. As the Board has determined that the Veteran’s symptoms warranted a TDIU effective December 10, 2009, eligibility to DEA is warranted as of that date as well. 

REMANDED ISSUE

Entitlement to special monthly compensation based on the need for aid and attendance, or by reason of being housebound is remanded.

The issue of entitlement to special monthly compensation based on the need for aid and attendance, or by reason of being housebound is remanded to correct a duty to assist error that occurred prior to the Veteran’s election of the Higher Level Review RAMP lane. Based on the evidence of record at that time, VA had a duty to assist the Veteran by affording him an Aid & Attendance examination in accordance with 38 C.F.R. § 3.159(c)(4). 

The Veteran seeks entitlement to special monthly compensation based on aid and attendance or housebound status. Under 38 U.S.C. § 1114(l), special monthly compensation is payable if, as the result of service-connected disability, the Veteran has an anatomical loss or loss of use of both feet, or of one hand and one foot; has blindness in both eyes with visual acuity of 5/200 or less; is permanently bedridden; or is so helpless as to be in need of regular aid and attendance of another person. 38 C.F.R. § 1114(l); 38 C.F.R. § 3.350(b). 

Under 38 C.F.R. § 3.352(a), factors considered in determining the need for regular aid and attendance include, in pertinent part: inability of claimant to dress or undress himself, or to keep himself ordinarily clean and presentable; inability to attend to the wants of nature; or incapacity, physical or mental, which requires care or assistance on a regular basis to protect the claimant from hazards or dangers incident to his or her daily environment. It is only necessary that the evidence establish that the veteran is so helpless as to need regular aid and attendance, not that there be a constant need. 

Here, the record does not contain sufficient competent medical evidence to decide the claim, but contains competent evidence so as to trigger VA’s duty to assist. 38 C.F.R. § 3.159(c)(4). Specifically, in a November 2017 independent medical examination, the Veteran and his wife reported that the Veteran’s wife took responsibility for ensuring that the Veteran ate and took his medications in a timely manner. The Veteran’s wife also reported that she felt the need to keep a constant eye on the Veteran as his poor concentration led to him tripping over his own feet as well as household objects, putting him at risk for dangerous falls. The Veteran’s wife stated that she felt like she had to take care of the Veteran like he was a child and attributed the situation to the Veteran’s PTSD. 

The statements from the Veteran and his wife contrast with VA treatment records surrounding the time of the November 2017 examination. At mental health treatment visits, the Veteran has appeared to be more independent than indicated by his November 2017 statements. Furthermore, he has had numerous functional status screens during mental health nursing appointments. Those screens have, at times, acknowledged a need for assistance with bathing more than one part of the body, but have otherwise rated the Veteran as highly independent. See e.g., Orlando VAMC Treatment Notes, August 9, 2011; May 22, 2012; June 11, 2013; April 22, 2014; April 15, 2015; April 4, 2016; January 27, 2017; February 14, 2018. 

Accordingly, the evidence of record prior to the Veteran’s election of the Higher Level Review RAMP lane presented two conflicting narratives regarding the Veteran’s independence and the need for an Aid & Attendance examination was triggered prior to a decision on the claim. 

The matter is REMANDED for the following action:

Correct the duty to assist error by scheduling the Veteran for a VA Aid & Attendance examination. The examiner should review the entire claims file and the report of examination should include discussion of the Veteran’s documented history and assertions. All indicated tests and studies should be accomplished and all clinical findings should be reported in detail.

The examiner should specifically consider the Veteran’s contentions in the November 2017 independent medical examination and opinion by Dr. J.M., as well as the concurrent statements submitted by the Veteran and his spouse in November 2017. The examiner should also consider VA treatment records evaluating the Veteran’s functional capacity. 

The examiner should set forth all examination findings, along with complete rationale for the conclusions reached, in a printed report.

 

V. Chiappetta

Veterans Law Judge

Board of Veterans’ Appeals

ATTORNEY FOR THE BOARD M. Giaquinto, Associate Counsel